In SHOLLENBERGER *v.* BRINTON, MERVINE *v.* SAILOR, BURTON *v.* DAVIS, and GRAHAM *v.* MARSHALL, the decrees and judgments were affirmed:—In KROENER *v.* COLHOUN, SANDFORD *v.* HAYS, and LAUGHLIN *v.* HARVEY, the decrees and judgments were reversed.

[Shollenberger *v.* Brinton.]

In SHOLLENBERGER *v.* BRINTON, a rule was afterwards entered to show cause why the decree in that case should not be changed to a decree reversing the decree below, and dismissing the bill. A similar rule was entered in MERVINE *v.* SAILOR.

After argument, the opinion of the court was delivered by

WOODWARD, C. J.—*Shollenberger* v. *Brinton :* This case came into this court by appeal or certificate from the Nisi Prius, and was considered and decided in connection with six other cases, all of which involved the construction and application of the Act of Congress of 25th February 1862, making treasury notes a legal tender in payment of private debts. In some of the cases, but not in this one, the constitutionality of the Act of Congress was denied. In this case, and some others of the group, the question whether the principal of a ground-rent deed was a debt within the meaning of the Act of Congress was raised. As the ground-rent covenant in this case stipulated for the payment of the rent in "lawful silver money of the United States," and the ground-rent tenant was authorized to redeem the ground-rent at any time by the payment of the principal ($3535), in "lawful money as aforesaid," another question was whether this sum was payable in legal-tender notes.

On all the questions in the seven cases we delivered *seriatim* opinions at Harrisburg in May last, and then deduced from our conflicting opinions, as well as we could, the conclusions appropriate to each case, and entered the judgment in each case to which the conclusion of a majority of our number conducted us. The result, in this case, was an affirmance of the decree at Nisi Prius. Counsel, conceiving that in this case we had mistaken the proper application of the conclusions of a majority, obtained the above rule, and were fully heard in support of it. It is now to be decided.

The ground-rent deed stipulated, as already stated, for the payment of the rent and the redemption of the principal " in lawful silver money of the United States." After the passage of the Act of Congress, commonly called the Legal-Tender Law, Shollenberger, the owner of the premises subject to the ground-rent, tendered to the owner of the rent the full amount of the principal in legal-tender notes, and demanded an extinguishment and release, which being refused, a bill in equity was filed to compel her to accept the tender notes and release the encumbrance. It came on before our brother Agnew, at Nisi Prius, before whom the constitutionality of the Act of Congress was waived, and who therefore ruled nothing upon that point. But he ruled that the principal of the ground-rent was a debt within the meaning of the Act of Congress, and as such was payable in greenbacks, and gave the plaintiff the decree prayed for. The defendant appealed, and in this court assigned four errors, all of which amounted to

[Shollenberger *v.* Brinton.]

no more than that the court erred in holding that under the terms and conditions of the ground-rent deed the complainant was entitled to a release and extinguishment of the rent upon payment of the amount in legal-tender notes.

Now, whatever the questions in the other six cases, it is beyond all doubt that in this case the only question presented was whether a ground-rent stipulated to be paid in silver money was a debt within the meaning of the Act of Congress. And whoever will recur to the opinions we delivered at Harrisburg will see that a majority of this court were on the affirmative of that question, and therefore an affirmance of the decree at Nisi Prius was an inevitable consequence.

Counsel embarrassed themselves, and to some extent us also, by arguing on the effect of a diversity of opinions on the bench in a case presenting two or more questions. If, for instance, three distinct questions arise in the same cause, and two judges are for affirming the court below on one question, but for reversing on the others, and other two are for affirming on question two, but for reversing on both or either of the other questions, and three are for affirming on the third question, is the judgment or decree below to be affirmed or reversed? We had a legal puzzle similar to this in Reed *v.* Penrose, 12 Casey 214, where but three of our number sat, and where there were three questions on which we divided in opinion. We solved that case, however, as all similar cases must be solved, by considering that as a court of errors and appeals we receive records from lower courts with the presumption that all things have been rightly done and that no error appears. Hence the plaintiff in error is put to his assignment of errors, which is in the nature of a declaration wherein he sets forth in clear and concise terms the errors of which he complains, and which he must prove by the record. The defendant in error pleads *in nullo erratum est.* Thus the parties are at issue, and the burthen of proof is on the plaintiff in error by virtue of the legal presumption alluded to above. Before he can demand judgment of reversal he must convince a majority of a quorum of this court that he has established some one of the errors assigned. When we all sit, three judges must concur in finding the same error, else the judgment or decree stands affirmed, no matter how diverse the reasons of the judges, if their respective reasons bring a majority to the sustaining of the same error. But if there be not this *concurrence* upon one and the same point, it signifies nothing that every judge on the bench finds error in the record.

Where, however, as in the case now before us, there was only a single error alleged upon the record, or, to speak more descriptively, where the four errors assigned raised only a single question for decision, the opinion of three judges in a full bench

[Shollenberger *v.* Brinton.]

affirms or reverses necessarily, though those opinions upon the point presented may rest on diverse and even inconsistent reasons. In such a case the difficulties alluded to above cannot arise. Nor would they have been supposed to exist in this case if counsel had not taken opinions from us that were applicable to others of the cases before us at the same time, and applied them to this case. For instance, two judges thought the law unconstitutional, and therefore would have reversed any case in which the ruling that it was constitutional was assigned for error, but these two judges could not be added to the one or two who thought a ground-rent was not a debt, and thus a majority be obtained to reverse this decree, because in this case the constitutional question was not raised, and because also there was no concurrence of a majority for reversal upon the *same* point. To borrow from other cases, though they were considered and decided at the same time, rulings that were appropriate to their peculiar questions, and apply those rulings to reverse the decree in this case, where the same questions were not presented, would be a palpable mistake.

We have examined the authorities to which the learned counsel referred us, but we cannot see that either the authorities or the argument submitted require any alteration of our decree.

Let the rule therefore be discharged.

*Mervine* v. *Sailor :* This was an action on a ground-rent deed for a half-yearly instalment of the accruing rent; the plea of a tender of treasury notes ; a replication that the tender was insufficient because the rent was payable in " lawful silver money of the United States of America, each dollar weighing seventeen pennyweights and six grains at least ;" demurrer to that replication and judgment in the demurrer for defendant; and then a writ of error to this court. The judgment on demurrer was assigned for error.

I believe all the judges were of opinion that the money sued for was a debt, and a majority held that though stipulated to be paid in dollars of a certain weight, it was nevertheless a debt within the meaning and subject to the operation of the Act of Congress. A majority also held the act constitutional.

Then it is very plain that this was a judgment to be affirmed, unless the two who doubted whether a debt of this special description was subject to the Act of Congress were to be added to the two who doubted the constitutionality of the enactment, and a majority for reversing be thus made up. But we have stated in Brinton's case, herewith decided, that such a mode of making up a majority to reverse is not to be tolerated. It would subvert the theory of our judicial system, and complicate our administration of law and equity in inextricable difficulties. It would be also a denial of justice to parties, for he who has obtained a judgment

[Mervine v. Sailor.]

or decree by judicial process has a right to the fruits of it unless a majority of the court of revision agree in finding the same error in the record.

The rule is discharged.

In GRAHAM v. MARSHALL, also, a rule was entered to show cause why the judgment of affirmance entered in the above cause should not be set aside, and a judgment of reversal in whole or in part be entered instead thereof.

The opinion of the court was delivered by

WOODWARD, C. J.—The above rule was granted upon the earnest complaint of counsel that the several opinions delivered by us at Harrisburg last spring, on the constitutionality of the Act of Congress of 26th February 1862, commonly called the Legal-Tender Law, ought to have resulted in the reversal, rather than the affirmance of this judgment. We had seven cases before us, including this one, which, though differing in facts and circumstances, were all supposed to involve the constitutionality of that enactment; and, instead of discussing each case separately, we discussed the principles common to them all, and then entered, in each case, the judgment to which the principles as settled by a majority of the court led us. Under the allegation that we had made a misapplication of our principles to this case, we granted the above rule and consented to hear argument; and the question now to be decided is, whether, upon the law as declared in those opinions, our judgment in this case is erroneous in whole or in part.

The action was founded on a paper sometimes called a certificate of deposit, and sometimes a promissory note, in the words and figures following:—

" Allegheny, March 24th 1862.

" No. 916.

" Six months after date, the Merchants' and Farmers' Bank will pay James Graham, Esq., fourteen thousand one hundred and forty-five dollars, with interest till due, at the rate of five per cent. per annum. If not presented at maturity, it will be continued as a renewal.

" $14,145, specie.　　　　　　　, J. C. PORTER, Cashier."

When this paper was presented for payment, on the 27th March 1863, specie was demanded, which the cashier refused to pay, but offered legal-tender notes in payment, which were declined, and this suit was then brought to recover specie or its equivalent. On the trial of the cause the learned judge who presided in the Common Pleas of Allegheny, delivered the following charge to the jury:—

" We instruct you peremptorily that the Act of Congress is

[Graham *v.* Marshall.]

constitutional; that it is immaterial whether there was a special agreement to pay in specie or not, or whether the agreement or contract was made before the passage of the Act of Congress or afterwards, the agreement is simply void. You will return a verdict simply for the amount of the certificate of deposit with interest at five per cent. till demand, 27th March 1863, adding interest from bringing of suit to the present time."

To the judgment entered upon the verdict that was rendered under these instructions, the plaintiff took a writ of error, and in this court assigned two errors, the first of which set forth the first of the above sentences, omitting only the words that affirmed the constitutionality of the Act of Congress, and beginning with the words "that it is immaterial;" and the second error set forth the second sentence of the charge in *hæc verba*. It has been said that the constitutional question was not raised in this case, and that we erred in mixing it up with six other cases that did involve that question, and the proof of this position is in the omission, from the first of the above assignments of error, of that part of the charge which affirmed the constitutionality of the Act of Congress.

Why counsel omitted that part of the charge in their assignment, unless they believed it sound and unassailable, is hard to imagine; but as they have, on the present argument, placed upon the record, with leave of the court, an assignment that the act *is* unconstitutional in respect to such contracts as the present one, it is impossible to suppose that they concurred in opinion with the court below upon this point, and meant to abide by it.

But, however this may be, we think the first error, as originally assigned, could not be decided without passing upon the constitutional question, for the only ground upon which the court held the contract void, as a specie contract, was that the Act of Congress was constitutional and made it void. If the act were unconstitutional it could not make the contract void, and therefore when counsel asked us to reverse the court for holding the contract void, on the footing of the constitutionality of the act, they compelled us to pass upon the question as truly as if they had assigned the first member of the sentence for error. That assignment raised the constitutional question, and nothing else; for, although we might not agree with the learned judge in pronouncing a specie contract since the Act of Congress void, we would agree with him that, assuming the constitutionality of the enactment, the debt was solvable by greenbacks. Whether that assumption could be made, was necessarily involved in the case, and hence no wrong was done to the plaintiff when we considered his case in connection with the six other cases before us at the same time.

A majority held the act to be constitutional; but still the act

[Graham *v.* Marshall.]

was not applicable to *this* contract, say counsel, because the note or certificate was dated subsequent to the passage of the act. This position is not well taken in point of fact.

The original deposit was made in September 1861, and the certificate or note in suit was only a renewal of that contract. If this certificate be regarded as an independent contract as of the day of its date, then, although subsequent to the Act of February 1862, it was prior to several other Acts of Congress making treasury notes a legal tender in payment of debts. Thus, on the 17th January 1863, Congress authorized the issue of one hundred millions of treasury notes, on the 3d March 1863, of one hundred and fifty millions, including the hundred millions authorized in January, and of four hundred millions of interest-bearing notes, and all these notes were made legal tenders in payment of debts.

Here there were five hundred and fifty millions of greenbacks made legal tenders after the date of the paper in suit, and before the debt was demanded. But even if the position of counsel were well taken, would it follow that the Act of Congress, declared constitutional in respect to *prior* debts, was unconstitutional in respect to *subsequent* debts? So far from this being the necessary inference, the better argument would lead to an exactly *opposite* result. An act of legislation might be quite constitutional as to all contracts made under it, but utterly void as to contracts existing at its date. Retroactive legislation is always regarded with jealousy. The faith and obligation of contracts have generally been supposed to be beyond the reach of legislative power, and although a majority of us held they were not in this instance, yet surely if existing contracts were not, subsequent ones could with no show of reason claim to be. Counsel said it would be absurd to apply the Act of 1862 to subsequent contracts; it seems to us that it would be more absurd to confine its operation to prior contracts.

If, therefore, we should concede the postulate of counsel, that this contract was subsequent to the legislation in question, we could not adopt their conclusion; but their premises, no more than their conclusions, are sustainable.

What then is the effect of this constitutional legislation upon a specie contract? I do not stop to question whether this *is* a specie contract. Though there is but one word, in the corner of the paper, to import a specie contract, yet the bankers examined thought that sufficient, and I agree to it. A specie contract, then, means that it is one to be redeemed or paid in the gold or silver currency which alone were legal tenders before the Acts of Congress of 1862–3. Though the old Acts of Congress, which made gold and silver legal tenders, are supplied, they are not repealed, by these recent acts. Such contracts, therefore, are lawful, not

[*Graham v.* Marshall.]

void, as the court below said; and a tender of gold and silver coin would be a valid tender. But, under these latter Acts of Congress, greenbacks are no less a valid tender. The precise effect of the legislation, therefore, is to reduce specie contracts to the paper-money standard—to compel the man who has bargained for gold or silver coin to accept greenbacks. As a question of power, we repeat that such legislation is much more defensible in regard of *subsequent* than of *prior* contracts; for, in subsequent contracts, parties treat with their eyes wide open to existing law, whilst in prior contracts they anticipated no such legislative interference with their bargains.

What then, cannot parties so contract as to displace the latter Acts of Congress, and compel themselves to perform according to the old law? To prove that they could, counsel selected from our statutes regulating weights and measures, the instance of oats, which, by an Act of Assembly of 1818, were required to weigh thirty-two pounds to the bushel, but by the Act of 13th April 1859 (Purd. 1012), a bushel of oats is required to weigh only thirty pounds. Undoubtedly, a contract for oats at thirty-two pounds to the bushel would be a lawful contract; or for coal or iron at 2240 pounds to the ton, though our statute ton consists of 2000 pounds; and in these cases, and all others like them, the law, if it could not enforce specific performance, would compensate the purchaser in damages according to the tenor of the contract.

But the analogy is delusive in this, that neither oats, nor coal, nor iron, nor any other commodity of commerce, not even gold and silver in bullion, has ever been declared a legal tender in payment of debts. The Constitution made the " *coins*" of gold and silver a legal tender, and these Acts of Congress have made treasury notes a legal tender, establishing thus a final and irreversible standard of all values. If Congress had said that oats at thirty pounds to the bushel should be a legal tender in payment of all debts, what would your contract for thirty-two pounds avail against the supreme power? Such a contract would be included in " *all debts*," and so would be solvable by the legal standard of values. Weights and measures are regulated by statutes, and may be adjusted between parties by private contracts, but currency and legal tenders belong only to the supreme power in the State to regulate, and cannot be controlled by private contract. A promise to pay in a better currency than the legal standard is not an unlawful contract, and a moral obligation may result from it, but the law accounts this obligation an imperfect one because it cannot be enforced at law. It is enforceable only *in foro conscientiæ*. When parties come into courts of law with their contracts, they must accept the rule the law-making

[Graham v. Marshall.]

power has prescribed. The legal obligation of money contracts can never rise higher than the legal standard of money. Debtors will pay their debts in the cheapest currency they can, and when Congress declares that all private debts shall be payable in a depreciated paper currency, and the courts hold such legislation constitutional, it signifies nothing that a particular debtor stipulated to pay in specie; his creditor must take that which the law has authorized the debtor to tender. Had the plaintiff below contracted for gold or silver as *articles of commerce*, he would have been entitled to recover their value, the same as if any other commodity had been contracted for; but he contracted for *specie* which is currency and a legal tender, and the legislative power has provided an equivalent in a certain form of paper, and has authorized every debtor to pay in that, *and in this exercise of legislative power the contract rights of the creditor were sacrificed*.

How injurious such legislation is to private rights and public morals has been heretofore shown, and is apparent to every observing and reflecting man. I was among those who denied the constitutional power of Congress to inflict so great a wrong upon the country, but I am bound to defer to the authority of a majority of this court, when regularly exercised, and if this legislation is constitutional it must have its course, though it make havoc of every specie contract in the land.

Now in regard to the second assignment, we think there was clear error in directing a verdict that denied the plaintiff interest from the time of demand till the impetration of his writ. The demand was made on the 27th March 1863, and suit was brought 23d February 1864. Here were eleven months and twenty-seven days for which the plaintiff was entitled to recover interest at 6 per cent. on the principal sum in addition to what the court directed the jury to allow.

Is it necessary to reverse the judgment and send the case back to get this correction made? We think not. Our power to "*modify*" judgments is just as undoubted under the Act of 1836, as our power to affirm or reverse; and the modification here is not of a finding of the jury, for the jury acted only as the clerks of the court to register the court's decision. The verdict was dictated by the court, and as much their act as the judgment rendered thereon. In a case so circumstanced, we can reach the justice due to the parties by increasing the judgment to the true amount, as if it were a case stated.

As to the right of the plaintiff to recover interest from the time of demand, we cannot doubt, for though there was an offer to pay in treasury notes, there was no legal tender of them proved such as would stop interest; and if a banker withhold a customer's

[Graham *v.* Marshall.]

deposit after demand, we see no reason why he should not pay interest like all other defaulting debtors.

The judgment is affirmed for the amount directed by the court below, to be increased by legal interest added to the principal sum, from 17th March 1863 to 23d February 1864, and it is referred to the prothonotary of this court to ascertain the amount of the judgment so affirmed.

Strong and Agnew, Js., dissented from so much of this opinion as applied the terms of the Act of Congress to special contracts payable in specific coin ; and

Agnew, J., delivered the following opinion :—

The rule in this case did not open the discussion of the questions arising in the legal tender cases, but was intended to correct a supposed misapplication of the principles decided by the court to the facts of this particular case ; and, as precisely stated by the chief justice, " the question now to be decided is, whether, upon the law as declared in those opinions, our judgment in this case is erroneous in whole or in part." Upon this question I concur in the decision just rendered. But, in the opinion read, occasion is taken to discuss the merits of one of the points heretofore decided. From this I must dissent ; both because it is unnecessary to the decision of the question before us, and because the conclusions are, in my judgment, unfounded.

The argument starting with the assumption that the Act of Congress of 26th February 1862 embraces a contract such as this, very easily reaches the conclusion that the power of the law is superior to that of the parties, and disables them from contracting for the payment of specie, and the contract may therefore be satisfied with legal tenders. But this begs the question, for it is not how far Congress can override the contract, but whether the contract is really within the intention of the enactment. Starting with the assumption referred to, it is not difficult to conceive how injurious such legislation is to private rights, or to descant upon the great wrong upon the country ; of all which we are forcibly reminded. There is, however, a prior question to be decided, before the conclusion sought to be established can be reached, to wit: the interpretation of the legal-tender clause. If contracts specially payable in a specified kind of coin are not within the meaning and intention of the clause, the whole argument fails. On this question, it seems to me, the injury to private rights, and the wrong done to the country, by an interpretation which forbids all special contracts for coin, afford a powerful argument against an interpretation so injurious. It is a rule of interpretation that when general words in a statute embrace cases,

[Graham *v.* Marshall.]

and produce consequences, not within the mind of the lawmaker, and not intended to be inflicted, judicial interpretation will confine them to the true object intended to be attained. This is certainly better than to suffer exacerbation and perhaps exaggeration of the injurious consequences to reflect upon the lawmaker.

Having in my opinion upon the legal-tender cases shown, as I think, that the terms of the legal-tender clause are clearly subject to implied exceptions ; that where there are several kinds of lawful money, parties are nowhere forbidden to contract for payment in a particular kind ; that an election of kind belongs to the debtor, who can as well make it beforehand in his contract as afterwards, because it is unforbidden ; that the interpretation which embraces coin contracts strikes out of existence rights of property and actual values ; and that there is a remedy at law in the assessment of the damages which can be applied to contracts payable in coin ; I shall not now enter into the discussion of the question of interpretation, but, referring to that opinion, content myself with concurring in the judgment discharging the rule and correcting the interest ; but dissenting from the reasoning of the opinion upon a question not germain, as it seems to me, to the special matter before us.